No. 121,014

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL EARL GENSON III,
*Appellant*.

SYLLABUS BY THE COURT

1.

A culpable mental state is not an essential element of the crime of failure to register under the Kansas Offender Registration Act (KORA) because the Legislature specifically provided that violation of KORA is a strict liability crime.

2.

The United States Supreme Court has not delineated a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not.

3.

In determining whether a statute violates substantive due process because it is a strict liability offense, we consider whether the statute regulates public welfare, whether the conviction causes substantial stigma, and whether the penalty for the offense is severe.

1

4.

K.S.A. 2019 Supp. 21-5201 requires voluntary conduct or voluntary omission for criminal action. Thus a defendant who cannot rely on a lack of a mens rea may still have a defense that the voluntary act or omission requirement of the actus reus was not met.

5.

The statute making a KORA violation a strict liability offense does not violate substantive due process.

6.

A jury instruction that states the "verdict must be founded entirely upon the evidence admitted and the law as given in these instructions" is legally correct and does not impermissibly deprive a jury of the power of jury nullification.

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Opinion filed December 18, 2020. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Bethany C. Fields*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., ATCHESON and GARDNER, JJ.

GARDNER, J.:  Daniel Earl Genson III appeals his conviction for failing to register under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq. Arguing that he should not have been held criminally responsible because of his mental illness, Genson challenges the constitutionality of K.S.A. 2019 Supp. 21-5209 (stating the mental disease and defect defense) and K.S.A. 2019 Supp. 21-5203(e) (making KORA violations a strict liability crime). Genson also argues that the district court erred by failing to

2

instruct the jury about mental culpability and jury nullification and erred by barring evidence of his mental illness that supported nullification. For the reasons stated below, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Genson with failing to register under KORA after he did not register in November 2017. In response, Genson notified the district court of his intent to present a defense of mental disease or defect under K.S.A. 22-3219. In a motion to continue, Genson explained that he was sent to Osawatomie State Hospital on December 3, 2017—"less than 3 days after the alleged violation." The State objected to the use of an insanity defense, arguing that failing to register under KORA was a strict liability crime that does not allow for an insanity defense as prescribed. See K.S.A. 2019 Supp. 21-5209. Genson countered that a KORA violation is not a strict liability offense but even if it were, evidence of his mental illness was admissible to show why he failed to register in November. But the district court agreed with the State and ruled that Genson could not present a mental disease or defect defense at trial of a strict liability crime.

At the beginning of trial, the State moved to bar evidence of Genson's mental health. Genson responded that such exclusion of relevant evidence would infringe on his right to present a defense and on the jury's right to determine criminal liability. Genson also argued that it was unconstitutional to make a KORA violation a strict liability crime. But the district court sustained the State's motion to exclude the evidence of mental illness, finding that a violation for failing to register under KORA was a strict liability offense that did not require proof of a mental state. Thus a mental defect defense under K.S.A. 2019 Supp. 21-5209 was inapplicable.

At trial, the State called Shannon Ascher, the sole witness to testify. Ascher worked as an investigations secretary for the Riley County Police Department. She

testified that Genson first registered as an offender on August 29, 2017. On that day, Ascher told Genson of the law and the registration requirements that he had to follow. She gave him a brochure that explained the registration requirements. She reviewed the whole pamphlet with Genson and marked on it the dates on which he was required to register. She also orally told Genson that he needed to register in May, August, November, and February. She gave him an appointment card for his date to register in November. She also gave Genson a written acknowledgment form that explained the registration rules. Genson read through that acknowledgment, initialed each line, and then signed and dated it.

In addition to requiring Genson to register on the stated months, the documents required Genson to tell Ascher in person if his address or phone number changed. Ascher told Genson of that requirement, and Genson complied with that requirement—on September 18 he reported his new phone number, and on October 9, 2017, he reported his new address. On both dates, Genson signed and dated acknowledgment forms.

But Genson did not show up for his appointment to register in November. Ascher tried to call Genson at his phone number and at his mother's, unsuccessfully. Ascher generally tries to call an offender soon after they miss an appointment, then again near the end of the month. She did so with Genson but did not reach him. So Ascher had no contact with Genson in November and Genson never registered in November. Yet Genson returned to Ascher's office on December 15, 2017, to update his information because he had missed the month of November. Each time Ascher met with Genson, his demeanor and actions seemed "normal" to her.

Genson presented no evidence. But before resting he renewed his motion to rely on a mental disease or defect defense, proffering this evidence:

- The State had involuntarily committed Genson to Osawatomie State Hospital in early December after he asked his mother to take him there;
- in the weeks before his commitment, he was not properly medicated for his mental health issues;
- Ascher knew that under state statute, Osawatomie State Hospital had a duty to register for its patients' undergoing treatment;
- Genson's competency evaluation showed that he had been diagnosed with posttraumatic stress disorder, schizophrenia, split personality, depression, and anxiety; and
- Genson suffered from hallucinations and had a history of involuntary commitments and suicide attempts.

The court denied Genson's motion to rely on a mental disease or defect defense.

During the instruction conference, Genson proposed a jury instruction that included a mens rea for failing to register. He asked the court to instruct the jury that a KORA violation required the State to show the defendant had "intentionally failed" to register. The district court denied that request and instead followed the Pattern Jury Instruction, which has no mens rea element for a KORA violation.

The jury convicted Genson of failing to register under KORA. He then moved to dismiss his conviction as a violation of his due process rights, but the district court denied that motion.

At sentencing, the district court admitted evidence of Genson's mental health and granted Genson's motion for a downward departure based in part on Genson's mental illness. The district court then sentenced him to 24 months' probation and stayed his 24-month prison term.

Genson raises four issues on appeal.

## I. DID K.S.A. 2019 SUPP. 21-5209 UNCONSTITUTIONALLY ABOLISH THE INSANITY DEFENSE BY FORGOING THE MENTAL CAPACITY PRONG OF THE *M'NAGHTEN* TEST?

Genson first challenges the constitutionality of K.S.A. 2019 Supp. 21-5209, the mental disease and defect defense. This statute provides: "It shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." K.S.A. 2019 Supp. 21-5209. Before the enactment of this statute, Kansas used the *M'Naghten* rule as the proper test for an insanity defense. See *State v. Lamb*, 209 Kan. 453, 472, 497 P.2d 275 (1972); *State v. Nixon*, 32 Kan. 205, Syl. ¶ 1, 4 P. 159 (1884) (adopting the *M'Naghten* rule). Under that rule, a defendant could not be held criminally liable when he or she did not know the nature and quality of his or her act or, in the alternative, when he or she did not know right from wrong with respect to that act. *State v. Baker*, 249 Kan. 431, 450, 819 P.2d 1173 (1991).

But K.S.A. 2019 Supp. 21-5209 now embraces what is known as the "'mens rea approach.' The mens rea approach allows evidence of mental disease or defect as it bears on the mental element of a crime but abandons lack of ability to know right from wrong as a defense." *State v. Kahler*, 307 Kan. 374, 400, 410 P.3d 105 (2018), *aff'd Kahler v. Kansas*, 589 U.S. __, 140 S. Ct. 1021, 1037, 206 L. Ed. 2d 312 (2020).

Genson argues that K.S.A. 2019 Supp. 21-5209 abolishes the insanity defense, violating his:

- substantive due process rights under the Fourteenth Amendment to the United States Constitution and section 18 of the Kansas Constitution Bill of Rights;

6

- jury trial rights under section 5 of the Kansas Constitution Bill of Rights; and

- liberty interests under section 1 of the Kansas Constitution Bill of Rights.

The State responds in part that *Kahler* defeats Genson's substantive due process claims. *Kahler* held that Kansas did not abolish the insanity defense, but "only channels to sentencing, the mental health evidence that falls outside its intent-based insanity defense." 140 S. Ct. at 1031. *Kahler* further held that due process does not require Kansas to adopt an insanity test that turns on a defendant's moral incapacity:

> "We therefore decline to require that Kansas adopt an insanity test turning on a defendant's ability to recognize that his crime was morally wrong. Contrary to Kahler's view, Kansas takes account of mental health at both trial and sentencing. It has just not adopted the particular insanity defense Kahler would like. That choice is for Kansas to make—and, if it wishes, to remake and remake again as the future unfolds. No insanity rule in this country's heritage or history was ever so settled as to tie a State's hands centuries later." 140 S. Ct. at 1037.

*Preservation*

Genson concedes that he raises the issue of whether K.S.A. 2019 Supp. 21-5209 is unconstitutional for the first time on appeal. Issues not raised before the district court generally cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Likewise, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). But exceptions may apply when a newly asserted theory involves only a question of law arising on proved or admitted facts and finally determines the case or when consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

7

Genson must meet Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34), which requires an appellant to explain why an issue not raised below should be considered for the first time on appeal. Litigants who flout this rule risk a ruling that the issue is improperly briefed and will be considered waived or abandoned. *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). Our Supreme Court requires strict enforcement of this rule. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). Yet Genson does little to try to meet this standard—he merely recites the exceptions noted above and mentions his substantive due process rights, his liberty interest, and his jury-trial right.

The decision to review an unpreserved claim under an exception is a prudential one, so even when an exception supports a decision to review a new claim, we do not have to do so. *State v. Gray*, 311 Kan. 164, 169, 459 P.3d 165 (2020). We decline to reach the merits of Genson's claim that K.S.A. 2019 Supp. 21-5209 unconstitutionally abolished the insanity defense.

## II. DID THE DISTRICT COURT ERR BY DENYING GENSON'S REQUEST FOR A JURY INSTRUCTION THAT INCLUDED A MENS REA?

Genson next argues that the district court erred by denying his request to instruct the jury that it had to find that he "intentionally" failed to register under K.S.A. 2019 Supp. 22-4905(a). Genson now asserts that the district court should have instructed the jury that it had to find that he "knowingly" failed to register under K.S.A. 2019 Supp. 22-4905(a). The State maintains that the district court properly denied Genson's request because a KORA violation is a strict liability crime, so the jury need not determine his mens rea.

*Standard of Review and Basic Legal Principles*

We follow a four-step analysis when reviewing challenges to jury instructions: First, we consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review. Next, we apply unlimited review to determine whether the instruction was legally appropriate. Then, we determine whether sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, would have supported the instruction. Finally, if the district court erred, we determine whether the error was harmless, using the test and degree of certainty provided in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011). *State v. Murrin*, 309 Kan. 385, 391, 435 P.3d 1126 (2019).

As to preservation, the first step, Genson requested a mental culpability instruction in the district court, asking the court to instruct the jury that it must find that he "intentionally" failed to register under KORA. Although he now requests a "knowing" element, his request to the district court is enough to preserve the issue of whether the district court erred in not requiring a scienter requirement.

In our next step, we ask whether the requested instruction was legally appropriate. To be legally appropriate, the requested instruction must fairly and accurately state the applicable law when viewed in isolation and it must be supported by the particular facts of the case. *Murrin*, 309 Kan. at 392; see *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). Resolution of this issue requires statutory interpretation over which appellate courts have unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be determined. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019).

9

When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind its clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Ayers*, 309 Kan. at 164.

*K.S.A. 2019 Supp. 21-5203(e) Unambiguously Defines a KORA Violation as a Strict Liability Crime.*

A culpable mental state is an essential element of all Kansas crimes, "[e]xcept as otherwise provided" by statute. K.S.A. 2019 Supp. 21-5202(a). "A culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally', 'knowingly', or 'recklessly.'" K.S.A. 2019 Supp. 21-5202(a). And "[i]f the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." K.S.A. 2019 Supp. 21-5202(d).

K.S.A. 2019 Supp. 22-4903(a)—criminalizing the failure to register—is silent about mental culpability: "Violation of the Kansas offender registration act is the failure by an offender . . . to comply with any and all provisions of such act." But our Legislature fulfilled the exception clause of K.S.A. 2019 Supp. 21-5202(a) by listing strict liability crimes in K.S.A. 2019 Supp. 21-5203—previously K.S.A. 21-3204. Although K.S.A. 21-3204 traditionally limited strict liability offenses to misdemeanors and traffic offenses that clearly indicated a legislative purpose to impose absolute liability, see *State v. Lewis*, 263 Kan. 843, 858, 953 P.2d 1016 (1998), the Legislature amended that statute effective July 2011. See L. 2010, ch. 136, § 14.

On that date, the Legislature included certain felonies as strict liability crimes and added KORA violations under K.S.A. 22-4901 et seq. to the list of strict liability crimes in K.S.A. 21-5203:

"A person may be guilty of a crime without having a culpable mental state if the crime is:

(a) A misdemeanor, cigarette or tobacco infraction or traffic infraction and the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described;

(b) a felony and the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described;

(c) a violation of K.S.A. 8-1567 or 8-1567a, and amendments thereto [DUI];

(d) a violation of K.S.A. 8-2,144, and amendments thereto [commercial vehicle DUI]; or

(e) a violation of K.S.A. 22-4901 et seq., and amendments thereto [KORA]." K.S.A. 2019 Supp. 21-5203.

So a culpable mental state is required "[e]xcept as otherwise provided," and the Legislature specifically provided by this statute that a violation of KORA is an exception.

Genson argues that K.S.A. 2019 Supp. 21-5203, when read along with K.S.A. 2019 Supp. 21-5202(a), (d), K.S.A. 2019 Supp. 22-4903(a), and K.S.A. 2019 Supp. 22-4905, fails to "plainly dispense with any mental element" as required under K.S.A. 2019 Supp. 21-5202(a), (d). Genson focuses on the word "may" in K.S.A. 2019 Supp. 21-5203: "A person *may* be guilty of a crime without having a culpable mental state" under KORA. (Emphasis added.) Genson reasons that the use of "may" makes the statute permissive, so the district court did not have to treat a KORA violation as a strict liability offense. Because a court may or may not treat a KORA violation as a strict liability offense, Genson argues, the Legislature failed to "plainly dispense" with the mental culpability requirement, as is necessary for a strict liability crime.

But another panel of our court recently considered and rejected this same argument in *State v. Stoll*, No. 117,081, 2018 WL 4264867 (Kan. App. 2018) (unpublished opinion), *rev. granted* 309 Kan. 1353 (2019). The *Stoll* panel held that "'[m]ay' in K.S.A. 2017 Supp. 21-5203 is not used in the permissive sense. It's not

11

equivalent to 'A person has permission to be guilty of a crime without a culpable mental state.' Rather, the 'may' here suggests possibility—a person can be guilty of a crime without a culpable mental state." 2018 WL 4264867, at *3. Although the *Stoll* panel acknowledged that the word "may" could be used in the permissive sense, making it different from the mandatory "shall," use of the word "may" in K.S.A. 2019 Supp. 21-5203 does not establish that two or more interpretations of the statute can be fairly made to create ambiguity. See *Glaze v. J.K. Williams*, 309 Kan. 562, 564, 439 P.3d 920 (2019).

We agree with the *Stoll* panel's reading of the use of the word "may" and find that it is the only fair reading of K.S.A. 2019 Supp. 21-5203(e). Trying to read the statute another way would create ambiguity where it does not naturally exist.

Genson then argues that K.S.A. 2019 Supp. 22-4905's use of the term "incapacitation" proves that KORA contemplates the offender have *some* capacity. That statute provides:

> "Any such offender who cannot physically register in person with the registering law enforcement agency for such reasons including, but not limited to, *incapacitation* or hospitalization, as determined by a person licensed to practice medicine or surgery, or involuntarily committed pursuant to the Kansas sexually violent predator act, shall be subject to verification requirements other than in-person registration, as determined by the registering law enforcement agency having jurisdiction." K.S.A. 2019 Supp. 22-4905(a). (Emphasis added.)

We disagree with Genson's analysis. This language does not state that incapacitation is a defense to the crime of failing to register or, conversely, that capacity is an element of the crime that the State must prove. Instead, the statute simply provides a method other than in-person registration for incapacitated persons to register. Permitting an alternative means of registration for incapacitated persons fails to show that KORA

12

offenders must be capacitated in the sense of being morally culpable. Rather, it shows that even incapacitated persons must meet the verification requirements.

The plain language of the KORA statute shows it is a strict liability crime. And our court has consistently so held. See, e.g., *State v. Gilkes*, No. 119,949, 2019 WL 6041504, at *5 (Kan. App. 2019) (unpublished opinion) (noting reason for failing to register irrelevant due to "strict liability nature" of KORA violation); *State v. Bailey*, No. 108,551, 2013 WL 3970198, at *1-2 (Kan. App. 2013) (unpublished opinion) (refusing to address the merits of a defendant's argument that the State presented insufficient evidence to prove the requisite intent because the defendant "could be found guilty of a violation of the KORA without having a culpable mental state"); *State v. Eden*, No. 108,615, 2013 WL 5976063, at *5 (Kan. App. 2013) (unpublished opinion) (finding as of July 1, 2011, a violation of KORA is a crime for which a person may be guilty without having a culpable mental state). Those decisions are correct.

Because a KORA violation is a strict liability crime, the district court properly denied Genson's requested jury instruction for a mens rea element.

III. Is K.S.A. 2019 Supp. 21-5203(e) Unconstitutional Because it Criminalizes Failing to Register Under the Kansas Offender Registration Act Without Requiring a Mental Culpability Element?

Alternatively, Genson contends that if a KORA violation is a strict liability crime, the statute that makes it so (K.S.A. 2019 Supp. 21-5203[e]) violates state and federal substantive due process rights and sections 1 and 5 of the Kansas Constitution Bill of Rights. K.S.A. 2019 Supp. 21-5203(e) provides that a person may be guilty of a crime without having a culpable mental state if the crime is a violation of KORA. Genson has not stated whether his constitutional claim is a facial challenge to the statute or an as-applied challenge.

13

Genson raises his sections 1 and 5 claims under the Kansas Constitution Bill of Rights for the first time on appeal. The State argues that Genson failed to preserve these issues, and we agree. Although Genson recites exceptions that arguably permit us to reach the merits of these issues, we decline to do so, mindful that the decision to review an unpreserved claim under an exception is a prudential one. See *Gray*, 311 Kan. at 169.

Genson did, however, argue to the district court that K.S.A. 2019 Supp. 21-5203(e) violated his substantive due process rights. We thus reach the merits of his argument that making a KORA violation a strict liability crime violates his substantive due process rights under the Fourteenth Amendment and section 18 of the Kansas Constitution Bill of Rights.

Kansas courts generally interpret provisions of our Kansas Constitution the same as the United States Supreme Court's interpretation of corresponding provisions of the United States Constitution. We do so here, noting that Genson makes no distinction between the state and federal provisions. See *State v. Finley*, 273 Kan. 237, 242, 42 P.3d 723 (2002) (rejecting defendant's argument that we should give more protection under our state Constitution's Due Process Clause than is afforded under the Fourteenth Amendment to the United States Constitution).

The Fourteenth Amendment to the United States Constitution states, in pertinent part, that no State shall "deprive any person of life, liberty, or property without due process of law." "'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated." *Ernest v. Faler*, 237 Kan. 125, 129, 697 P.2d 870 (1985) (quoting *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 [1974]). Substantive due

14

process has been described as protection from arbitrary government action. *Darling v. Kansas Water Office*, 245 Kan. 45, 51, 774 P.2d 941 (1989).

> "In addition to guaranteeing fair procedures, the Due Process Clause of the Fourteenth Amendment 'cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.' *Lewis*, 523 U.S. at 840 (quotation omitted). This substantive component guards against arbitrary legislation by requiring a relationship between a statute and the government interest it seeks to advance. If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest. *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). But if an enactment burdens some lesser right, the infringement is merely required to bear a rational relation to a legitimate government interest. [521 U.S.] at 728; *Reno v. Flores*, 507 U.S. 292, 305, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993) ('The impairment of a lesser interest . . . demands no more than a "reasonable fit" between governmental purpose . . . and the means chosen to advance that purpose.'); *Seegmiller v. LaVerkin City*, 528 F.3d 762, 771-72 (10th Cir. 2008) ('Absent a fundamental right, the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest.' (citing *Reno*, 507 U.S. at 305))." *Dias v. City and County of Denver*, 567 F.3d 1169, 1181 (10th Cir. 2009).

The necessary elements of a substantive due process claim depend on whether the claim is based on an executive or legislative act. See *Dias*, 567 F.3d at 1182. Genson's claim is based on a legislative act. We exercise unlimited review over this question of statutory interpretation and a statute's constitutionality. *Alvarez*, 309 Kan. at 205 (statutory interpretation); *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018) (statute's constitutionality). We must interpret a statute in a manner that renders it constitutional if there is any reasonable construction that will maintain the Legislature's apparent intent. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014). We presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. *Gonzalez*, 307 Kan. at 579. But see *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1132-33,

15

442 P.3d 509 (2019) (changing the" presumption of constitutionality in cases dealing with 'fundamental interests' protected by the Kansas Constitution"). Because Genson challenges the statute's constitutionality, he carries the burden of overcoming that presumption.

*The Legislature has the power to enact strict liability crimes.*

We begin with the well-established recognition that the Legislature has the authority to create strict liability crimes:

> "That it is within the power of the legislature to forbid the doing of an act and make its commission criminal, without regard to the intent or knowledge of the doer, is well established in our jurisprudence. [Citations omitted.]
>> "The principle is well stated in 1 Wharton's Criminal Law and Procedure, s 17, as follows:
>>> "'It is within the power of the legislature to declare an act criminal irrespective of the intent or knowledge of the doer of the act. In accordance with this power, the legislature in many instances has prohibited, under penalty, the performance of specific acts. The doing of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted and the knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt. The only fact to be determined in these cases is whether the defendant did the act. . . .' (p. 28)." *State v. Logan*, 198 Kan. 211, 216, 424 P.2d 565 (1967).

In *State v. Avery*, 111 Kan. 588, 207 P. 838 (1922), the defendant urged that the criterion of guilt in criminal law was wrongful intent. The court, in answering the contention, said:

> "[T]he Legislature may, for protection of the public interest, require persons to act at their peril, and may punish the doing of a forbidden act without regard to the knowledge, intention, motive, or moral turpitude of the doer. There is no constitutional objection to

16

such legislation, the necessity for which the Legislature is authorized to determine. *State v. Brown*, 38 Kan. 390, 393, 16 Pac. 259; 16 C. J. 76-78." 111 Kan. at 590.

See *Logan*, 198 Kan. at 215-16 (upholding strict liability for one who transports or possesses alcoholic liquor contrary to the provisions of the Liquor Control Act).

More recent cases reflect no change in that time-honored rule. See *State v. Merrifield*, 180 Kan. 267, 269, 303 P.2d 155 (1956); *State v. Creamer*, 26 Kan. App. 2d 914, 917-18, 996 P.2d 339 (2000).

*The United States Supreme Court has upheld strict liability crimes in limited circumstances.*

We recognize, however, that although the Legislature has the authority to declare the elements of an offense, it "must act within any applicable constitutional constraints in defining criminal offenses." *Liparota v. United States*, 471 U.S. 419, 424 n.6, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985).

The United States Supreme Court has rarely addressed the constitutionality of strict liability crimes. In *Morissette v. United States*, 342 U.S. 246, 259-60, 72 S. Ct. 240, 96 L. Ed. 288 (1952), the Court discussed its prior strict liability cases:

> "It was not until recently that the Court took occasion more explicitly to relate abandonment of the ingredient of intent, not merely with considerations of expediency in obtaining convictions, nor with the malum prohibitum classification of the crime, but with the peculiar nature and quality of the offense. We referred to ' . . . a now familiar type of legislation whereby penalties serve as effective means of regulation', and continued, 'such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.' But we warned:  'Hardship there doubtless may be under a

17

statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting.' *United States v. Dotterweich*, 320 U.S. 277, 280-281, 284[, 64 S. Ct. 134, 88 L. Ed. 48 (1943)]."

The Court approved the conclusion in its prior cases upholding strict liability crimes, *United States v. Behrman*, 258 U.S. 280, 42 S. Ct. 303, 66 L. Ed. 619 (1922), and *United States v. Balint*, 258 U.S. 250, 42 S. Ct. 301, 66 L. Ed. 604 (1922), under the circumstances there. *Morissette* characterized the *Balint* and *Behrman* offenses as belonging to a category where the crimes depend on no mental element, but consist only of forbidden acts or omissions, and relate to regulations that affect public health, safety, or welfare. 342 U.S at 252-54.

In *Balint*, the Court overruled the contention that there can be no conviction on an indictment which makes no charge of criminal intent but alleges only selling a narcotic forbidden by law. Chief Justice Taft recognized that some statutes require no intent:

> "'While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes even where the statutory definition did not in terms include it . . . , there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court. . . .' *United States v. Balint*, 258 U.S. at 251-52.
>
> "He referred, however, to 'regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of mala in se,' and drew his citation of supporting authority chiefly from state court cases dealing with regulatory offenses. 258 U.S. at 252." *Morissette*, 342 U.S. at 258-59.

But *Morissette* found "[a] quite different question here is whether we will expand the doctrine of crimes without intent to include those charged here." 342 U.S. at 260. It

18

answered that question negatively, holding that criminal intent is an essential element of the crime of knowing conversion of Government property. 342 U.S. at 272-73.

Five years later, the United States Supreme Court found a strict liability statute unconstitutional in *Lambert v. California*, 355 U.S, 225, 228, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957). Although that case dealt with a registration statute, Genson does not rely on *Lambert* here, and the State distinguishes it.

In *Lambert*, the Los Angeles Municipal Code made it unlawful for any convicted person to remain in the city for more than five days without registering with the Chief of Police. Lambert lived there for over seven years and had been convicted of a felony, yet had not registered. The Court held: "Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process." 355 U.S. at 229-30.

The Court held that due process demands that the defendant be on notice that the conduct may be subject to potential regulation. The Court found the ordinance in *Lambert* unconstitutional because the registration law did not provide the kind of notice that would shift to the defendant the burden to discern the facts and discover the potential regulation. 355 U.S. at 229-30.

The State correctly notes that unlike Lambert, Genson knew he had to register under KORA, as evidenced by Ascher's unrefuted testimony and Genson's compliance with his KORA requirements in August, September, and October. And Genson does not claim lack of notice, which generally raises a question of procedural due process, but rather a substantive due process violation. So *Lambert* offers us little guidance.

*No specific criteria exist for strict liability crimes.*

19

More recently, the United States Supreme Court noted that strict liability crimes bear a generally disfavored status, but may withstand constitutional requirements in limited circumstances:

"While strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements, see *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57[, 30 S. Ct. 663, 54 L. Ed. 930] (1910), the limited circumstances in which Congress has created and this Court has recognized such offenses, see *e.g., United States v. Balint, supra*; *United States v. Behrman*, 258 U.S. 280[, 42 S. Ct. 303, 66 L. Ed. 619] (1922); *United States v. Dotterweich*, 320 U.S. 277[, 64 S. Ct. 134, 88 L. Ed. 48] (1943); *United States v. Freed,* [401 U.S. 601, 91 S. Ct. 1112, 28 L. Ed. 2d 356 (1971)], attest to their generally disfavored status. See generally ALI, Model Penal Code, Comment on § 2.05, p. 140 (Tent. Draft No. 4, 1955); W. LaFave & A. Scott, Criminal Law 222-223 (1972)." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437-38, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978).

Genson pushes this analysis further by contending that the United States Supreme Court has upheld strict liability crimes as constitutional under only three circumstances which, he asserts, are not met here:

- When the offense carries a slight penalty;
- When the conviction does not lead to substantial stigma; and
- When the statute regulates inherently dangerous or deleterious conduct.

But we find no good authority for the assertion that strict liability crimes are constitutional only if they meet those three circumstances. Genson cites *Shelton v. Secretary, Dept. of Corrections*, 802 F. Supp. 2d 1289, 1298 (M.D. Fla. 2011), a federal habeas case finding the partial elimination of mens rea as an element of Florida drug statutes violated due process. True, *Shelton* stated a strict liability offense "has only been held constitutional if" one of the three factors above is met. 802 F. Supp. 2d at 1298. But

20

*Shelton* appears to stand alone in that assertion. And *Shelton* was reversed. See *Shelton v. Secretary, Dept. of Corrections*, 691 F.3d 1348 (11th Cir. 2012) (finding that the district court applied an improper legal standard for federal habeas review).

We find it unwise and unnecessary to try to define the boundaries of strict liability crimes because the United States Supreme Court has not done so. Rather, the Court has specifically declined to take that step:

> "Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static." *Morissette*, 342 U.S. at 260.

Similarly, in *Staples v. United States*, 511 U.S. 600, 619-20, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994), the United States Supreme Court underscored that broader approach. We do not read *Staples*, as Genson does, to require that strict liability offenses fall within one of the three limited categories that the case addressed. Rather, the Court carefully noted that it was *not* delineating a precise line or setting forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not:

> "In short, we conclude that the background rule of the common law favoring *mens rea* should govern interpretation of [26 U.S.C.] § 5861(d) in this case. Silence does not suggest that Congress dispensed with *mens rea* for the element of § 5861(d) at issue here. Thus, to obtain a conviction, the Government should have been required to prove that petitioner knew of the features of his AR-15 that brought it within the scope of the Act.
> "We emphasize that our holding is a narrow one. As in our prior cases, our reasoning depends upon a commonsense evaluation of the nature of the particular device or substance Congress has subjected to regulation and the expectations that individuals

21

may legitimately have in dealing with the regulated items. In addition, we think that the penalty attached to § 5861(d) suggests that Congress did not intend to eliminate a *mens rea* requirement for violation of the section. As we noted in *Morissette:* 'Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not.' 342 U.S., at 260. We attempt no definition here, either. We note only that our holding depends critically on our view that if Congress had intended to make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons, and to subject them to lengthy prison terms, it would have spoken more clearly to that effect. Cf. *United States v. Harris*, 959 F.2d 246, 261 (CADC), *cert. denied* 506 U.S. 932 (1992)." *Staples*, 511 U.S. at 619-20.

See also *Lambert*, 355 U.S. at 228 (acknowledging that the Court had never articulated a general constitutional doctrine of mens rea; finding "[t]here is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."); *Powell v. Texas*, 392 U.S. 514, 535, 88 S. Ct. 2145, 20 L. Ed. 2d 1254 (1968) ("[T]his Court has never articulated a general constitutional doctrine of mens rea.").

### *Substantive due process analysis*

Nonetheless, we agree that factors similar to those Genson advocates are relevant to the substantive due process analysis for strict liability crimes.

"In rehearsing the characteristics of the public welfare offense, we, too, have included in our consideration the punishments imposed and have noted that 'penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation.' *Morissette,* 342 U.S. at 256. We have even recognized that it was '[u]nder such considerations' that courts have construed statutes to dispense with *mens rea.*" *Staples*, 511 U.S. at 617-18.

We thus examine the relevant factors—public welfare, penalty, and reputation—below.

22

But unlike the federal statute at issue in *Staples*, the Kansas statute is not silent about its strict liability nature. Rather, as detailed above, the Kansas Legislature has spoken clearly by specifically listing KORA violations among crimes that may be committed without the actor having a culpable mental state. See K.S.A. 2019 Supp. 21-5203(e); K.S.A. 2019 Supp. 21-5202(a), (d). Because our Legislature has spoken clearly that a KORA violation is a strict liability crime, we are interpreting rather than construing the Kansas statute. See *State v. Gensler*, 308 Kan. 674, 677, 423 P.3d 488 (2018) (legislative intent governs statutory interpretation; reliance on plain, unambiguous language "'the best and only safe rule'" for determining intent; only if language is ambiguous does court move to wider examination of canons of statutory construction).

1. *The public welfare*

First, we ask whether the public welfare rationale applies to a KORA violation. See, e.g., *Staples*, 511 U.S. at 617-18, addressing "public welfare" statutes. Genson asserts that strict liability statutes are limited to those that "regulate[] inherently dangerous or deleterious conduct," and that failure to register is not inherently dangerous. We believe that cuts too narrowly.

The Legislature may establish strict liability offenses for the protection of the public. See *Steffes v. City of Lawrence*, 284 Kan. 380, 390, 160 P.3d 843 (2007) (citing *Logan*, 198 Kan. at 216). The Kansas Supreme Court applied the public welfare rationale in *State v. Mountjoy*, 257 Kan. 163, 175-77, 891 P.2d 376 (1995). *Mountjoy* held that the unauthorized practice of the healing arts is a strict liability crime under the public welfare doctrine:

> "Among all the objects sought to be secured by government, none is more important than the preservation of the public health. *State, ex rel., v. Fadely,* 180 Kan. at

23

665. It is fundamental that where a statute is designed to protect the public, the language of that statute must be construed in the light of the legislative intent and purpose and is entitled to a broad interpretation so that its public purpose may be fully carried out. *The common-law rule which requires the element of criminal intent to hold a person criminally responsible for his or her conduct contains a well-recognized exception for public welfare offenses.*

"The purpose of K.S.A. 65-2803 is to protect the public from the unauthorized practice of the healing arts. The unauthorized practice of the healing arts is an offense which, under the public welfare doctrine, does not require the element of criminal intent." 257 Kan. at 177 (Emphasis added.)

*Mountjoy* relied on many other Kansas cases recognizing the public welfare doctrine.

"[T]he *Fairmont* court noted that 'the [public welfare] doctrine has been recognized in this jurisdiction many times. (*State v. Merrifield*, 180 Kan. 267, 303 P.2d 155; *State v. Beam*, 175 Kan. 814, 267 P.2d 509; *State v. Brown*, 173 Kan. 166, 244 P.2d 1190; *State v. Avery*, 111 Kan. 588, 207 Pac. 838; and *City of Hays v. Schueler*, 107 Kan. 635, 193 Pac. 311.)' 196 Kan. at 82. After noting that the dairy industry was affected with a public purpose and constitutionally subject to regulation after *Nebbia v. New York*, 291 U.S. 502, 54 S. Ct. 505, 78 L. Ed. 940 (1934), the *Fairmont* court held that the absence of a required criminal intent in doing the acts proscribed by the Dairy Practices Act was not fatal for lack of due process. 196 Kan. at 82.

"Other Kansas cases cited by the State where the public welfare doctrine has been followed are: *State v. Logan*, 198 Kan. 211, 424 P.2d 565 (1967) (violation of the Kansas Liquor Control Act); *State v. Merrifield*, 180 Kan. 267, 303 P.2d 155 (1956) (driving while license suspended). See also *State v. Robinson*, 239 Kan. 269, 718 P.2d 1313 (1986) (furnishing alcoholic liquor to a minor); *State v. Riedl*, 15 Kan. App. 2d 326, 807 P.2d 697 (1991) (various traffic violations); *City of Wichita v. Hull*, 11 Kan. App. 2d 441, 724 P.2d 699 (1986) (city DUI ordinance); *City of Overland Park v. Estell,* 8 Kan. App. 2d 182, 653 P.2d 819 (1982), *rev. denied* 232 Kan. 875 (1983) (city traffic

24

ordinance violation); *State v. Baker*, 1 Kan. App. 2d 568, 571 P.2d 65 (1977) (speeding)."
257 Kan. at 175-76.

Similarly, a KORA violation is a public welfare offense. The legislative purpose of KORA is "to protect the public from sex offenders as a class of criminals who are likely to reoffend and to provide public access to the registration information required when an offender falls within the provisions of the KORA. See *State v. Wilkinson*, 269 Kan. 603, 609, 9 P.3d 1 (2000); *State v. Stevens*, 26 Kan. App. 2d 606, 609, 992 P.2d 1244 (1999), *rev. denied* 268 Kan. 895 (2000)." *State v. McElroy*, 281 Kan. 256, 263, 130 P.3d 100 (2006), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). See *State v. Fredrick*, 292 Kan. 169, 173, 251 P.3d 48 (2011). Previously named the Kansas Sex Offender Registration Act, KORA was expanded in 1997 to include registration requirements for those who commit certain violent (but not sex-related) offenses and certain other types of offenders. L. 1997, ch. 181, §§ 7-14.

Genson contends that the KORA violation statute is not narrowly tailored to serve a compelling governmental interest. As support, Genson cites testimony that no data shows the offender registry deters crime or decreases recidivism. Yet Genson has not shown that the purpose of the offender registry is either deterrence or decreasing recidivism of offenders. Rather, its purpose, as stated above, is to protect the public by giving law enforcement officers and the public information about where certain violent or other criminals live. Knowing where offenders live enables the public to assess the risk and take appropriate protective measures.

More fundamentally, Genson fails to show that we should apply strict scrutiny instead of the rational relationship test. Only if a legislative enactment burdens a fundamental right must the infringement be narrowly tailored to serve a compelling government interest. To determine whether the presence of mens rea in a criminal statute is a fundamental right, we first require a "'careful description' of the asserted fundamental

25

liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Genson claims that making KORA a strict liability crime violates due process because "eradicating mens rea offends the existence of justice." Although this statement of interest is not carefully drawn, we view Genson's asserted interest as a liberty interest in not being convicted of a failure to register crime absent proof of a culpable mental state.

Second, we ask whether that interest is "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg*, 521 U.S. at 720-21. So to show that the Legislature's exercise of its power to define an offense to exclude a mens rea violates due process, Genson must show that the statute offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

The Supreme Court has recognized that fundamental rights include those guaranteed by the Bill of Rights as well as certain "liberty" and privacy interests implicit in the Due Process Clause and the penumbra of constitutional rights. See *Glucksberg*, 521 U.S. at 720; *Paul v. Davis*, 424 U.S. 693, 712-13, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976). These special "liberty" interests include such rights as the rights to marry, to have children, to direct the education and upbringing of one's children, and to marital privacy. *Glucksberg*, 521 U.S. at 720. The interest Genson asserts is not among those that the Supreme Court has declared to be "fundamental."

And the Supreme Court is reluctant to expand substantive due process by recognizing new fundamental rights:

> "'[W]e ha[ve] always been reluctant to expand the concept of substantive due process
> because guideposts for responsible decision-making in this unchartered area are scarce
> and open-ended.' By extending constitutional protection to an asserted right or liberty

interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court. [Citations omitted.]" *Glucksberg*, 521 U.S. at 720.

Kansas cases have not examined an interest comparable to the one Genson asserts. But we find some guidance in cases examining the Sex Offender Registration and Notification Act (SORNA), the federal counterpart to KORA. The reporting requirements for SORNA, like those for KORA, turn on the offender's conviction alone. SORNA has been alleged to violate substantive due process, yet the circuits have upheld the registration and reporting requirements, finding no fundamental right is implicated:

> "Defendant here argues a deprivation of his liberty interest. Although the Supreme Court has recognized fundamental rights in regard to some special liberty and privacy interests, it has not created a broad category where any alleged infringement on privacy and liberty will be subject to substantive due process protection. See *Paul*, 424 U.S. at 713. The circuit courts that have considered substantive due process arguments regarding sex offender registries have upheld such registration and publication requirements finding no fundamental right implicated and no constitutional infirmities. *See, e.g., Doe v. Tandeske,* 361 F.3d 594, 597 (9th Cir.) (per curiam), *cert. denied*, 543 U.S. 817, 125 S. Ct. 56, 160 L. Ed. 2d 25 (2004) ('Persons who have been convicted of serious sex offenses do not have a fundamental right to be free from . . . registration and notification requirements. . . .'); *Doe v. Moore,* 410 F.3d 1337, 1344-46 (11th Cir.), *cert. denied,* 546 U.S. 1003, 126 S. Ct. 624, 163 L. Ed. 2d 506 (2005); *Gunderson v. Hvass*, 339 F.3d 639, 643 (8th Cir.2003), *cert. denied,* 540 U.S. 1124, 124 S. Ct. 1086, 157 L. Ed. 2d 922 (2004); *Paul P. v. Verniero*, 170 F.3d at 404, 405 (3d Cir.1999)." *United States v. Hernandez*, 615 F. Supp. 2d 601, 620-21 (E.D. Mich. 2009).

See also *In re W.M.*, 851 A.2d 431, 451 (D.C. 2004) (holding that since its sex offender registration act "does not threaten rights and liberty interests of a 'fundamental' order, appellants cannot succeed on their substantive due process challenge").

27

To the extent those cases do not examine the exact liberty interest Genson claims here, related to the strict liability nature of the crime, we rely on the Kansas Supreme Court's statement noted above: "The common-law rule which requires the element of criminal intent to hold a person criminally responsible for his or her conduct contains a well-recognized exception for public welfare offenses." *Mountjoy*, 257 Kan. at 177. So even if we assume that a person generally has a "fundamental right" to be free from conviction of a crime absent proof of the element of criminal intent, the public welfare exception to that rule applies here. Genson has not shown that K.S.A. 2019 Supp. 21-5203(e) burdens a fundamental right.

When a statute does not implicate fundamental rights, we ask whether it is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. "The rational basis standard is a very lenient standard. All the court must do to uphold a legislative classification under the rational basis standard is perceive any state of facts which rationally justifies the classification." *Peden v. State*, 261 Kan. 239, 258, 930 P.2d 1 (1996). In such cases, the government has no obligation to produce evidence or empirical data to sustain the rationality of a statutory classification. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). "[A]ny reasonably conceivable state of facts" will suffice to satisfy rational basis scrutiny. 508 U.S. at 313. The burden falls on the party attacking the statute as unconstitutional to "negative every conceivable basis which might support it." *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 (1940).

Thus, when the Kansas Supreme Court has reviewed legislation alleged to violate substantive due process, it has held that "'"statutes, if reasonably necessary for the effectuation of a legitimate and substantial state interest, and not an arbitrary or capricious in application, are not invalid under the Due Process Clause."'" *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 318, 532 P.2d 1263

28

(1975); see also *Brown v. Wichita State University*, 219 Kan. 2, 21, 547 P.2d 1015 (1976) (noting that when legislation is challenged as violative of due process, the challenger must demonstrate that the legislation bears no reasonable relation to a permissible legislative objective).

Similarly, substantive due process challenges to other state's sex offender registries have failed under the rational relationship test. See, e.g., *In re Detention of Garren*, 620 N.W.2d 275, 285 (Iowa 2000) (rejecting substantive due process challenge because of the "'reasonable fit between the governmental purpose and the means chosen to advance that purpose'"); see also *People v. Malchow*, 306 Ill. App. 3d 665, 672, 714 N.E.2d 583 (1999) (concluding that no substantive due process violation occurred because the statute "'bears a reasonable relationship to a public interest to be served'").

Genson fails to show that K.S.A. 2019 Supp. 21-5203(e) bears no reasonable relationship to the permissible legislative objective noted above. Rather, KORA meets the rational basis test because it is in the interest of government to protect the public from sexual and other violent offenders.

The nature of Genson's offense thus falls within the class of strict liability cases that may be upheld based on a public welfare rationale.

2. *Harm to reputation*

Second, we examine the degree of harm to one's reputation by the violation at issue—whether it does any "grave damage to an offender's reputation." *Morissette*, 342 U.S., at 256; see *Staples*, 511 U.S. at 617-18. Reputation means "[t]he esteem in which someone is held or the goodwill extended to or confidence reposed in that person by others, whether with respect to personal character, private or domestic life, professional

29

and business qualifications, social dealings, conduct, status, or financial standing." Black's Law Dictionary 1560 (11th ed. 2019).

Genson argues that a KORA violation is a felony, and that "felony" is a bad label, which is true. But Genson fails to go beyond the label to show that damage to his reputation flows from his failure-to-register felony. Genson does not show that an offender's failure to register is likely to be known to the general public or to the offender's community or social circle, as is necessary for it to impact the offender's reputation. But even if a failure to register were widely known in an offender's community, the public would likely view a failure to register as a mere technicality, having no impact on one's reputation.

But even if some stigma does flow from failing to register, that stigma pales in comparison to the preexisting stigma caused by the nature of the sexual, violent, or other offense that gave rise to the duty to register and that is already a matter of public record. See K.S.A. 2019 Supp. 22-4902 (listing the sex offenders, violent offenders, and others subject to KORA's registration requirements). See, e.g., *Welvaert v. Nebraska State Patrol*, 268 Neb. 400, 409, 683 N.W.2d 357 ( 2004) ("'[C]onsequences flow not from [a sex offender registration act's] registration and dissemination provisions, but from the fact of conviction, already a matter of public record.'"); *State v. White*, 162 N.C. App. 183, 194, 590 S.E.2d 448 (2004) ("[A]ny stigma flowing from registration requirements is not due to public shaming, but arises from accurate information which is already public."); *Meinders v. Weber*, 604 N.W.2d 248, 257 (S.D. 2000) ("The information contained in the sex offender registry is almost the same information available as a public record in the courthouse where the conviction occurred.").

This factor does not point to a substantive due process violation.

3. *The penalty*

Third, we consider the penalty for the violation. According to K.S.A. 2019 Supp. 21-6804(m), the sentence for a violation of K.S.A. 2019 Supp. 22-4903 is presumptive imprisonment. We thus agree with Genson that the presumptive penalty for a KORA violation is not necessarily "relatively small.'" *Morissette*, 342 U.S. at 256; *see Staples*, 511 U.S. at 617-18 Genson, however, got a relatively small penalty, likely because of his mental health issues—he got a downward departure and probation instead of prison. So the fact that a KORA violation is a felony with presumptive imprisonment carries little weight, as applied to Genson.

Nor does the fact that a KORA violation is a felony with presumptive prison time, by itself, show a substantive due process violation. *Staples* rejected a definitive rule that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense. *Staples*, 511 U.S. at 618-19. Instead, cases use a severe penalty as a factor tending to show legislative intent not to eliminate a mens rea requirement when the controlling statute lacks a clear statement that mens rea is not required:

> "Our characterization of the public welfare offense in *Morissette* hardly seems apt, however, for a crime that is a felony, as is violation of § 5861(d). After all, 'felony' is, as we noted in distinguishing certain common-law crimes from public welfare offenses, '"as bad a word as you can give to man or thing."' [342 U.S.] at 260 (quoting 2 F. Pollock & F. Maitland, History of English Law 465 (2d ed. 1899)). Close adherence to the early cases described above might suggest that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense. In this view, absent a clear statement from Congress that *mens rea* is not required, we should not apply the public welfare offense rationale to interpret any statute defining a felony offense as dispensing with *mens rea.* But see *United States v. Balint*, 258 U.S. 250, 42 S. Ct. 301, 66 L. Ed. 604 (1922).

31

"We need not adopt such a definitive rule of construction to decide this case, however. Instead, we note only that where, as here, dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement. In such a case, the usual presumption that a defendant must know the facts that make his conduct illegal should apply." *Staples*, 511 U.S. at 618-19.

Similarly, in *Gypsum*, 438 U.S. at 442 n.18, where Sherman Act antitrust statutes neither required nor dispensed with a mens rea, the Court found "the severity of these sanctions provides further support for our conclusion that the [Act] should not be construed as creating strict-liability crimes." Thus the penalty factor is used merely as a tool of statutory interpretation when the language of the statute is unclear, rather than a constitutional limit on the Legislature's power to define crimes.

Here, we have a clear statement from the Legislature that mens rea is *not* required for a KORA violation. Kansas' statute is explicit in its elimination of mens rea. So we are not construing a statute looking for legislative intent. So the fact that a KORA violation is a felony has no tendency to suggest that the Legislature did not intend to eliminate a mens rea requirement.

*No defense available*

Related to the penalty factor, Genson also contends that if KORA is a strict liability offense that presumes imprisonment, a mentally ill defendant can present no defense yet is doomed to 17 to 247 months in prison.

But Genson's premise is flawed. Even though the district court properly precluded evidence at trial of Genson's mental illness, the district court properly took that same evidence into account during sentencing. So the fact that a KORA violation is a strict liability offense does not compel the conclusion that the offender must serve prison time,

32

as Genson asserts. Genson's case illustrates this, as he got a downward departure and was sentenced to probation. The fact that the district court takes mental illness into account at sentencing cuts against a substantive due process claim.

And Genson fails to show that the lack of mens rea in the KORA statute negates all defenses at trial. See K.S.A. 2019 Supp. 21-5201(a) ("A person commits a crime only if such person voluntarily engages in conduct, including an act, an omission or possession."); *State v. Dinkel*, 311 Kan. 553, 559-60, 465 P.3d 166 (2020) (finding a defendant who cannot argue lack of mens rea may still argue, when appropriate, that the voluntary act or omission requirement of the actus reus was not met).

We find that K.S.A. 2019 Supp. 21-5203(e) does not violate substantive due process by making a KORA violation a strict liability crime.

## IV. DID THE DISTRICT COURT ERR BY DENYING GENSON'S REQUESTS RELATING TO JURY NULLIFICATION?

Finally, Genson argues that the district court violated his jury-trial right by preventing the jury from considering nullification evidence and by not instructing the jury about its power to nullify.

Genson asks this court to determine whether the district court committed clear error in failing to give the following jury instruction sua sponte:

> "'[Y]ou are entitled to act upon your conscientious feeling about what is a fair result in this case and acquit the defendant if you believe that justice requires such a result. Exercise your judgment without passion or prejudice, but with honesty and understanding. Give respectful regard to my statements of the law

33

> for what help they may be in arriving at a conscientious determination of justice in this case. That is your highest duty as a public body and as officers of this court.' PIK, Criminal, §51.03."

However, PIK Crim. § 51.03 was disapproved for use in *State v. McClanahan*, 212 Kan. 208, 215-16, 510 P.2d 153 (1973).

Genson also argues that the district court erred by precluding evidence of his mental health because that evidence would have supported jury nullification.

Genson's arguments conflict with the Kansas Supreme Court's recent decisions in *State v. Boothby*, 310 Kan. 619, 448 P.3d 416 (2019), and *State v. Toothman*, 310 Kan. 542, 448 P.3d 1039 (2019). Our Supreme Court has long held that "an instruction telling the jury that it may nullify is legally erroneous." *Boothby*, 310 Kan. at 630. Although juries have the power to nullify, a criminal defendant does not have the right to argue jury nullification. *Toothman*, 310 Kan. at 555-56; see *Boothby*, 310 Kan. at 630.

And the district court here gave the very instruction that the *Boothby* and *Toothman* court determined was legally correct: "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." See *Toothman*, 310 Kan. at 556; *Boothby*, 310 Kan. at 631. Based on this precedent, we find that the district court properly did not instruct the jury on its power to nullify and also properly excluded evidence of Genson's mental health in support of nullification.

Affirmed.

\* \* \*

ATCHESON, J., dissenting:  I respectfully dissent.

34

*1. An Overview*

The Kansas Legislature has chosen to criminalize violations of the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq. as felonies with substantial prison sentences that can be imposed on a person even if he or she lacks bad intent or unknowingly violates the law. The vast majority of criminal statutes prohibit and punish conduct considered obviously wrongful, such as murder or theft, or otherwise plainly injurious to the public welfare, such as manufacturing adulterated foods or drugs. But KORA punishes doing nothing—the failure to fill out registration forms at specified times and places. Criminalizing inaction in combination with a severe punishment imposed regardless of a person's intent runs counter to fundamental principles embedded in the criminal justice system and violates constitutional due process protections.

The crime created and the penalties imposed on violent offenders and drug offenders in K.S.A. 2019 Supp. 22-4903 for failing to register and report under KORA impermissibly deprive those groups of a fundamental liberty interest protected in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Unlike convicted sex offenders—the class originally targeted in KORA—those classes of offenders were added to the statutory scheme without any demonstrably comparable public welfare purpose, underscoring the constitutional infirmity of the harsh penalties they face for failing to comply with what amount to repetitive bureaucratic requirements. And the constitutional infirmity cannot be remedied through judicial interpretation of the statute. Therefore, the conviction of Defendant Daniel Earl Genson III, a violent offender, should be reversed and his sentence vacated.

The majority props up the criminal scheme in KORA with a series of arguments misconstruing applicable constitutional principles, mischaracterizing the law that has developed around strict liability offenses, and otherwise missing the mark. I cannot agree.

Because I would grant full relief to Genson on his due process challenge, I do not address his other arguments and express no views about the majority's handling of them.

*2. Genson's Collision with KORA*

For most of his life, Genson, who is now in his mid-20s, has been plagued with serious mental health issues resulting in multiple voluntary and involuntary commitments to hospitals for treatment. He was the subject of a competency evaluation during this case. Genson has been diagnosed as having a psychotic disorder and being schizophrenic. Without medication, he experiences auditory and visual hallucinations; he has engaged in self-destructive behaviors and has intermittently acted violently toward other persons, including family members, for years.

In April 2017, Genson was convicted of attempted voluntary manslaughter in Geary County District Court. As a result of that conviction, Genson was required to register and report as a "violent offender" under KORA. See K.S.A. 2019 Supp. 22-4902(e)(1)(D), (e)(4). He successfully registered and then reported for a while. But in the throes of a psychotic break, Genson failed to report in November 2017. Several days after the reporting deadline, he was involuntarily committed to a state mental hospital for treatment. In March 2018, the county attorney for Riley County charged Genson with a KORA registration violation, a severity level 6 person felony. See K.S.A. 2019 Supp. 22-4903(c)(1)(A). A jury convicted Genson in January 2019. The Riley County District Court denied Genson's request to present evidence about his deteriorated mental health in late 2017 or his mental health history generally because KORA is a strict liability crime requiring no criminal intent.

Based on his criminal history, Genson faced a guidelines sentence of incarceration for between 40 and 46 months with a statutory presumption that he be imprisoned. A month after the jury verdict, the district court sentenced Genson to 24 months in prison

36

and placed him on probation for 24 months. Genson has appealed, raising several challenges to his conviction and to criminal violations of KORA. I focus on his argument that KORA categorically violates the Due Process Clause of the Fourteenth Amendment by imposing an extended term of imprisonment for the failure to take an inherently innocuous act of, at best, indeterminate public benefit—all without requiring any deliberateness or bad intent. The Due Process Clause does not permit a state to impose that sort of criminal liability on its citizens.

*3. Criminal Violations of KORA*

The mechanics of KORA are integral to the constitutional violation it inflicts. The scheme identifies three classes of convicted defendants required to register and report: the "sex offender," as defined in K.S.A. 2019 Supp. 22-4902(b); the "violent offender," defined in K.S.A. 2019 Supp. 22-4902(e); and the "drug offender," defined in K.S.A. 2019 Supp. 22-4902(f). After serving any prison sentences for the crimes triggering KORA obligations, offenders are required to register with a designated law enforcement agency, typically the sheriff, in the counties where they live, work, and attend school. Offenders must provide an array of identifying information in an initial registration most of which is then available for public inspection and is posted in a publicly accessible data base the Kansas Bureau of Investigation maintains on the Internet. They are then required to report quarterly to each local agency, complete a form confirming their identification information, and pay an administrative fee to each agency. They must also notify any local agency of a change of residence, employment, or school attendance within three days. Depending on the underlying crime of conviction, offenders must continue registering and reporting for between 15 years and the rest of their lives. Genson is obligated to register and report until sometime in 2032.

When the Legislature enacted KORA in 1993, the scheme applied only to sex offenders. The Legislature added violent offenders in 1997 and drug offenders in 2007.

37

The Legislature has adjusted the reporting requirements over the years—typically making them more burdensome on the registrant—and extended the duration of the registration obligation. The legislative justification for KORA registration and reporting lay in what was represented to be the comparatively high rate of recidivism among sex offenders and the difficulty in reliably determining who might reoffend. See *State v. Scott*, 265 Kan. 1, 9-10, 961 P.2d 667 (1998); see also *State v. Mossman*, 294 Kan. 901, 909-10, 281 P.3d 153 (2012) (noting penological concerns about recidivism among sex offenders); cf. *Smith v. Doe*, 538 U.S. 84, 103, 105-06, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) (upholding comparable Alaska scheme requiring registration of sex offenders against challenge as violation of Ex Post Facto Clause of the United States Constitution and noting empirical studies showing sex offenders to be far more likely to reoffend than other convicted criminals). There is no like legislative history for violent offenders and drug offenders, as the classes added to KORA.[1]

[1]I have no background in social science research or statistics, but I fail to see how there could be—at least as to the remarkably high rate of recidivism attributed to the class of convicted sex offenders as compared with other convicted criminals. If "violent offenders" and "drug offenders," as expansively defined classes in KORA, had recidivism rates anything like "sex offenders," then it would seem sex offenders could not be characterized as having uniquely high rates.

Genson has not disputed the constitutional propriety of the registration and reporting requirements of KORA in this case. A majority of the Kansas Supreme Court has upheld those obligations against attacks as constitutionally impermissible punishment, finding them not to be punitive. See *State v. Meredith*, 306 Kan. 906, 909-10, 399 P.3d 859 (2017); *State v. Petersen-Beard*, 304 Kan. 192, 196-97, 377 P.3d 1127 (2016). Rather, Genson challenges the criminal penalties imposed in KORA for failing to register or report as statutorily required. That is a constitutionally distinct issue. See *Smith*, 538 U.S. at 102.

In 1993, KORA punished the failure of a convicted sex offender to register or report as a class A misdemeanor that would have carried a maximum sentence of one year in jail. Six years later, the Legislature increased the penalty to a severity level 10 nonperson felony and has since regularly ratcheted up the penalties. When Genson was prosecuted, a first offense for failing to register or report was a severity level 6 felony with presumptive guidelines punishments from 17 to 46 months in prison, depending on a given defendant's criminal history. Each 30-day period an individual failed to register or report created a separate violation, so someone failing to comply for 90 days could be charged with three counts with potentially consecutive sentences upon conviction. A failure to register or report for more than 180 days could be charged as an aggravated violation with presumptive prison sentences from 55 to 247 months. K.S.A. 2019 Supp. 22-4903. Repeat violators faced harsher penalties. Those remain the penalties under K.S.A. 2019 Supp. 22-4903.

Until 2011, the State had to prove persons acted with general criminal intent—that is, "to do what the law prohibits"—to convict them of KORA registration violations. *In re C.P.W.*, 289 Kan. 448, 454, 213 P.3d 413 (2009). The court elaborated on the requisite state of mind this way: "'[A]ll that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing.'" 289 Kan. at 454 (quoting *State v. Hodge*, 204 Kan. 98, 108, 460 P.2d 596 [1969]). General criminal intent entails acting deliberately, so the wrongful conduct is "willful and purposeful and not accidental." *State v. Sterling*, 235 Kan. 526, 527, 680 P.2d 301 (1984); see also Black's Law Dictionary 964 (11th ed. 2019) ("criminal intent" defined as "[a]n intent to commit an actus reus without any justification, excuse, or other defense"). As I discuss, that conforms to customary principles of criminal law and due process requirements, especially for felonies with substantial penalties.

*4. Failure to Register under KORA as a Strict Liability Crime*

Crimes, particularly felonies, typically consist of a mens rea (bad intent) and an actus reus (bad or prohibited act), so a defendant must intend to do the bad act. Applying those concepts to a criminal statute punishing the failure to act rather than the performance of action deemed misconduct calls for a bit of mental gymnastics. The actus reus entails doing nothing or not acting. So the mens rea or bad intent necessarily requires some knowledge or reason to know on the defendant's part that his or her mere passivity is wrongful. That would have been true for the crime of failing to register or report under KORA until 2011. The Legislature recodified the criminal code in 2010 and made some limited substantive changes and mostly technical revisions that went into effect the following year. Pertinent here, the Legislature expressly designated the failure to register or report under KORA as a crime having no "culpable mental state" or, in other words, a strict liability offense. K.S.A. 2019 Supp. 21-5203(e). With strict criminal liability, defendants may be found guilty even though they do not know or have reason to understand they have engaged in the act that violates the law. Speeding, for example, is a strict liability offense. So drivers can be guilty simply because they are inattentive to how fast they are traveling or even if they think they are driving at the speed limit because their speedometers incorrectly show them going slower than they actually are.

Historically, crimes required proof of both an actus reus and a mens rea to establish a defendant's guilt. This wasn't simply happenstance—it represents a fundamental principle of criminal liability. See *Morissette v. United States*, 342 U.S. 246, 250-52, 72 S. Ct. 240, 96 L. Ed. 288 (1952). The Court explained the requirement of bad intent was "no provincial or transient notion" but stands "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." 342 U.S. at 250. Proof of both "an evil-meaning mind" and "an evil-doing hand" to convict a defendant remains the cornerstone of modern criminal law, particularly in defining serious felonies.

40

342 U.S. at 251-52, 261-62. The deep-seated historical recognition of bad intent as an essential element of criminal liability animates the proper constitutional analysis in this case, as I discuss.

The creation of a limited range of strict liability crimes, largely to address public health and welfare concerns in an increasingly industrialized and urbanized society, also informs the constitutional considerations at issue here. The general contours of those offenses stand in marked contrast to the harsh penalties imposed in KORA for the declared felony of inaction for failing to register or report.

As outlined in *Morissette*, the increasing concentration and mobilization of people in metropolitan areas in the late 19th and early 20th centuries spurred government regulation to ensure at least some measure of efficiency and public welfare. Regulations, for example, took the form of what might be considered mundane traffic codes that imposed fines for violations without regard to fault or bad intent. Other regulations imposed basic standards of safety and sanitation in housing and workplaces to be enforced, in part, through civil sanctions and, in part, through criminal penalties imposed without proof of a mens rea. Similar measures, with similar means of enforcement, aimed to protect consumers from foods and pharmaceuticals mass produced indifferently or in adulterated forms. Many modern strict liability offenses continue that approach to policing heavily regulated industries or activities, including the manufacture of food and drugs and new areas such as the handling of environmentally hazardous substances, where the participants would be expected to inquire into the extent of those regulations and their potential civil or criminal liability for errant conduct. *Staples v. United States*, 511 U.S. 600, 607, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994); *Liparota v. United States*, 471 U.S. 419, 432-33, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985); *Morissette*, 342 U.S. at 254. Those offenses rest on a duty to know arising from the defendant's chosen occupational endeavors and seek to deter conduct implicating potentially life-threatening harms. See *Rivera v. State*, 363 S.W.3d 660, 669-70 (Tex. App. 2011).

Regulatory offenses typically imposed "relatively small" criminal penalties, and convictions were not considered infamous, which is to say they carried neither the penal sting nor the social stigma of felonies. *Morissette*, 342 U.S. at 252-56; see also Larkin, *Strict Liability Offenses, Incarceration, and the Cruel and Unusual Punishments Clause*, 37 Harv. J. L & Pub. Pol'y 1065, 1072-79 (2014) (outlining history of strict liability offenses). The Court more recently reemphasized that those "public welfare offenses" were conceived and "almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences." *Staples*, 511 U.S. at 616.

Strict liability offenses of that stripe, of course, not only remain but have proliferated since *Morissette*. 37 Harv. J. L & Pub. Pol'y at 1078-79. They continue to be marked generally by restrained criminal penalties, consistent with their antecedents. See *State v. Yishmael*, 195 Wash. 2d 155, 169-70, 456 P.3d 1172 (2020); see also *Rivera*, 363 S.W.3d at 670 (strict liability offenses often punished with only fines; "presumption against strict liability strengthen[ed]" by confinement as punishment); LaFave, 1 Subst. Crim. L. § 5.5 (3d ed. 2020). Contrary to the majority's suggestion, those cases consider the severity of the criminal penalties imposed in a statute as a substantial factor in determining if it creates a strict liability offense in the first place and, if so, whether the statute then conforms to constitutional due process protections. The prescribed punishment is more than "merely a tool" for construing a criminal statute that is silent as to any required intent, as the majority would have it. The kind and degree of punishment directly implicates a constitutional constraint on strict liability crimes.

In some situations, judicially reading an intent element or mens rea into a silent statute may simply align the prohibition with its direct common-law antecedents and the usual principles of criminal law favoring intent-based crimes. See, e.g., *Morissette*, 342 U.S. at 260-63 (theft or embezzlement of government property requires criminal intent, although no form of intent explicitly identified in statutory language). Likewise, imputing

a mens rea element to an ambiguous criminal statute can avert a potentially fatal constitutional defect, especially with felonies carrying harsh punishments. See, e.g., *United States v. X-Citement Videos, Inc.*, 513 U.S. 64, 70-71, 78, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994) (Court construes scienter requirement of statute more broadly than natural grammatical reading of language would suggest to avoid constitutional danger in punishing some proscribed conduct absent bad intent); *Rivera*, 363 S.W.3d at 670. But, as the majority points out, the Legislature in 2010 unmistakably declared the crimes punishing noncompliance with KORA to be strict liability offenses. There is no ambiguity on that score.

As a result, the criminal liability imposed on violent offenders and drug offenders for failing to register or report under KORA does not fit comfortably or even readily anywhere in the taxonomy of the law. The prison sentences are of a severity reserved for traditional crimes that require proof of both a proscribed act and a bad intent. And those crimes typically are *malum in se*—the forbidden conduct is intrinsically understood to be wicked. Most codified common-law crimes such as murder, rape, robbery, and theft are *malum in se*. If the criminalized behavior is not inherently malevolent, the offense is considered *malum prohibitum* or wrongful because the government has declared it wrongful. See *City of Hutchinson v. Weems*, 173 Kan. 452, 455, 249 P.2d 633 (1952); 1 LaFave, Subst. Crim. L. § 1.6(b). Failing to register or report under KORA is *malum prohibitum*. Those offenses typically carry lesser penalties. See *Morissette*, 342 U.S. at 255-56 (regulatory offenses); *United States v. Heller*, 579 F.2d 990, 993-94 (6th Cir. 1978) (federal crime of transmitting ransom demand in interstate commerce *malum in se* rather than *malum prohibitum* given nature of conduct in facilitating dangerous act and severity of penalty, citing *Morissette*, 342 U.S. at 255-56). Again, speeding is a good example of a *malum prohibitum* offense.

As I have outlined, the wrong under KORA is not conduct at all but the failure to act. The required action is registration and repeated reporting to law enforcement

43

agencies imposed on violent offenders as a class without a demonstrated public benefit, since the class has not been shown to be especially prone to recidivism and the stated purpose of KORA is to protect the public from sex offenders as a class specifically because *that* class is highly likely to reoffend. So a KORA violation differs from the affirmative and noxious conduct associated with public welfare crimes such as misbranding or adulterating food and drugs.

Finally, of course, failing to comply with KORA breaks with fundamental principles of criminal law by imposing felony liability and concomitantly severe penalties without any requirement for proof of bad intent or evil mindedness. The severity of the punishment and the absence of intent must be assessed in tandem to measure the constitutional impingement. It would be both poor constitutional reasoning and deceptive to say plenty of crimes are punished just as harshly and lots of crimes dispense with any element of intent, so KORA registration and registration violations must be permissible. The former are *malum in se* felonies requiring proof of criminal intent to convict; the latter are mostly misdemeanors or fineable offenses. KORA violations are neither, since they combine the absence of criminal intent with harsh penalties. The combination of the two then flags a serious constitutional deficiency. And the problem is only compounded when coupled with the lack of a clearly demonstrable public benefit tied to extending KORA to violent offenders and drug offenders. This case turns on that constitutional issue.

As I have said, this case is not about the propriety of requiring KORA registration or the scope of that registration. Genson has not challenged his obligation to register and report. And it is not about whether the Legislature can punish a failure to comply with KORA in some manner as a strict liability offense. And it does not presume to raise some challenge on behalf of sex offenders, since they, as a class, are demonstrably different and present a tangible public threat, as documented in the legislative history of KORA, that the other covered classes do not.

44

*5. Constitutional Considerations*

*A. Substantive Due Process Liberty Interests*

The Due Process Clause recognizes substantive liberty interests and procedural protections against government action depriving persons of both property rights and liberty interests, whatever their source, without a meaningful opportunity to be heard. This case and the KORA crimes at issue directly implicate substantive due process liberty interests and indirectly touch on procedural due process protections.

Paramount among the substantive liberty interests grounded in and protected through the Due Process Clause is an individual's right to be free from impermissible government detention. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) ("[T]he most elemental of liberty interests [is] the interest in being free from physical detention by one's own government."); *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (recognizing "[f]reedom from bodily restraint" to be at "the core of liberty" protected against impermissible government action); 504 U.S. at 90 (Kennedy, J., dissenting) ("As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution."); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). So "there are constitutional limitations on the conduct that a State may criminalize" through its police powers. *Foucha*, 504 U.S. at 80. That fundamental right is at stake here.

To be sure, the substantive due process liberty interests arising from the Due Process Clause are carefully circumscribed, since they lack explicit textual anchors in the language of the Constitution. But they command constitutional stature precisely because

they are "deeply rooted" in the nation's history and experience. *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Justice Benjamin Cardozo described substantive due process rights as part of "the very essence of a scheme of ordered liberty" and inseparably entwined with "'a principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S. Ct. 149, 82 L. Ed. 288 (1937). As *Morissette* makes clear, that history embraces a body (and theory) of criminal law that imposes severe penalties for wrongs entailing both bad acts and bad intent. A criminal statute that deviates from those precepts—as the proscriptions and penalties for failing to comply with KORA do—necessarily implicates a fundamental right to liberty. Strict liability offenses obviously are not inherently unconstitutional, but they are subject to constitutional limitations consistent with the fundamental liberty interest protected in the Due Process Clause.[2]

[2]Actions of government officials also may violate substantive due process protections of the Fourteenth Amendment if their character is arbitrary and "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-47, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998); *Katz v. Kansas Dept. of Revenue*, 45 Kan. App. 2d 877, 896, 256 P.3d 876 (2011). In *Lewis*, the Court appeared to tie the arbitrary or conscience shocking standard for a constitutional deprivation to "executive action." 523 U.S. at 847-48 & n.8. The Tenth Circuit Court of Appeals has declined to apply it to legislative enactments, i.e., statutes. See *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015); *Dias v. City and County of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). The point seems to have caused some disagreement. See *Galdikas v. Fagan*, 342 F.3d 684, 690 n.3 (7th Cir. 2003) (noting ambiguity and uncertainty as to scope of standard). Other circuit courts have considered the conscience shocking character of legislative action. See, e.g., *B & G Const. Co., Inc. v. Director of Office of Workers' Compensation Programs*, 662 F.3d 233, 255 (3d Cir. 2011); *Obsession Sports Bar & Grill v. City of Rochester*, 706 Fed. Appx. 53 (2d Cir. 2017) (unpublished opinion). I do not venture into the controversy, since the conscience shocking standard would simply augment my constitutional analysis based on a fundamental right.

The penal provisions of KORA set out in K.S.A. 2019 Supp. 22-4903, then, contravene a fundamental due process liberty interest. And they do so in a way that deviates materially from the historical tradition embodied in this country's criminal laws

by imposing harsh penalties for violations without any bad intent or mens rea. See *Chapman v. United States*, 500 U.S. 453, 465, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991) ("Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees."); *Bell v. Wolfish*, 441 U.S. 520, 535-56, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (punishment may only follow "an adjudication of guilt in accordance with due process of law"). For that reason, the statute receives no presumption of constitutionality upon judicial review as would, for example, a statute codifying a common-law crime requiring both an actus reas and mens rea or a statute defining a public welfare offense with modest penalties. In turn, we should examine the statute using a strict scrutiny standard. See *Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358, 129 S. Ct. 1093, 172 L. Ed. 2d 770 (2009) (legislative decision infringing on fundamental right subject to strict scrutiny ); *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458, 108 S. Ct. 2481, 101 L. Ed. 2d 399 (1988) (statute interfering with fundamental right subject to strict scrutiny); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983); cf. *State v. Ryce*, 303 Kan. 899, 957, 368 P.3d 342 (2016) (criminal penalty for refusing blood-alcohol test infringes on substantive Fourth Amendment right triggering strict scrutiny). Strict scrutiny review requires the government to establish that a challenged statute furthers a compelling governmental interest and is narrowly tailored to advance that interest. *Plyler v. Doe*, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); *Bostic v. Schaefer*, 760 F.3d 352, 375 & n.6 (4th Cir. 2014); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012).

Engaged on those terms, the constitutionality of the criminal provisions of KORA in K.S.A. 2019 Supp. 22-4903 can be readily decided as to violent offenders. As I have already outlined, the registration and reporting requirements the criminal penalties are supposed to encourage serve no especially significant or immediate public purpose, since

that class of offenders has not been shown to have a demonstrably higher rate of recidivism than the run of offenders generally. The stated legislative purpose and legal justification for KORA rest on the particularly high rate at which sex offenders reoffend. And that purpose can't simply be superimposed on violent offenders and drug offenders to justify their inclusion in K.S.A. 2019 Supp. 22-4903.

Even assuming a legitimate government objective in requiring violent offenders to register and report, the penalties in K.S.A. 2019 Supp. 22-4903 have not been narrowly tailored to advancing that objective. That would seem to be especially true with the current sanctions that both dispense with criminal intent and impose harsh felony punishments. Nothing suggests the original misdemeanor penalties, that permitted up to a year in jail, were ineffective in achieving compliance with KORA or that the current punitive scheme has been measurably more effective. The government has offered no legislative or public policy purpose for the conversion of KORA violations from intent-based crimes to strict liability crimes in the 2010 recodification of the criminal code. The elimination of intent as an element of the crime invariably would make violations easier to prove. But that cannot itself constitutionally justify creating an offense that impermissibly diminishes a fundamental liberty interest.

In short, the criminalization of the failure to register and report as set out in K.S.A. 2019 Supp. 22-4903 violates the fundamental due process rights of the class of violent offenders defined in KORA. As a result, the statute cannot be enforced against Genson or that class. I would reverse Genson's conviction and vacate his sentence for that reason.[3]

[3]I have not arbitrarily carved out the class or group of "violent offenders" in reaching my conclusion. As I have outlined, KORA itself identifies three distinct classes of convicted offenders required to register and report and, thus, face criminal prosecution for failing to do so. I have simply applied Genson's due process challenge to the statutory class to which he belongs. I expect that analysis could lead me to the same conclusion as to drug offenders. Given the legislative history of KORA and what has been accepted social science and psychological research on "sex offenders" as a group, the outcome isn't

as obvious, and I offer no view on it. But the constitutional propriety of KORA violations as strict liability felonies, with extended imprisonment as a prescribed punishment, for the defined classes of violent offenders or drug offenders is not in any way tied to the propriety of those punishments for the class of sex offenders.

Because I would decide this case in Genson's favor under the Due Process Clause of the United States Constitution, I venture no analysis of or opinion on his constitutional challenge based on sections 1 and 5 of the Kansas Constitution Bill of Rights.

To preserve the constitutionality of a statute, courts often construe the challenged language in a manner that averts the potential defect. They will read ambiguous language to favor constitutionality or fill in a statutory gap to do so. See *Chapman*, 500 U.S. at 464; *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 367, 361 P.3d 504 (2015). The penal provisions in KORA, however, do not accommodate that sort of judicial guardianship. As the majority notes, the Legislature has plainly declared KORA violations to be strict liability crimes by including them in K.S.A. 2019 Supp. 21-5203 that identifies a limited number of offenses permitting conviction without "a culpable mental state." An appellate court could, perhaps, strike down only that part of K.S.A. 2019 Supp. 21-5203(e) covering KORA, while leaving intact the description of the KORA crimes in K.S.A. 2019 Supp. 22-4903. That description in KORA does not address intent. Presumably, then, the default mechanisms in K.S.A. 2019 Supp. 21-5202(d) and (e) would impute a reckless intent to the judicially altered version of KORA. But the resulting statutory scheme would have been judicially rewritten, not merely construed or interpreted. And that's an impermissible fix for a constitutional defect. *Chapman*, 500 U.S. at 463; *Hoesli*, 303 Kan. at 367-68. Reducing the statutory punishments in KORA to bring them in line with conventional sanctions for strict liability offenses would be a more pronounced judicial overreach.

The proper course here requires voiding K.S.A. 2019 Supp. 22-4903 for violent offenders. See *Hoesli*, 303 Kan. at 367-68 (statute should be declared unconstitutional if

plain meaning of language requires that result). The Legislature could then craft what it considers an appropriate and presumably constitutional substitute.

### B. Considering Lambert:  Required Notice and Due Process

Alternatively, Genson's conviction should be reversed and the case remanded consistent with the United States Supreme Court's rejection of a registration ordinance covering convicted felons that made the failure to comply a strict liability crime. *Lambert v. California*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957). The short decision in *Lambert* provides a second line of constitutional analysis undercutting the penal provisions in KORA and Genson's conviction.

The Los Angeles ordinance at issue in *Lambert* required persons convicted of any felony to register with the police chief if they remained in the city for five consecutive days or entered the city five times in a 30-day period. Each day a felon failed to register could be charged as a separate violation. Lambert had been convicted of forgery years earlier and had never registered, despite living in Los Angeles for a long time. She was arrested on suspicion of another crime but was charged with and convicted of failing to register. Lambert was placed on probation for three years and fined $250. I presume failing to register under the ordinance was a misdemeanor, although the opinion never specifically identifies the crime as a misdemeanor or a felony or describes the maximum penalties.

The Court reversed Lambert's conviction for violating the ordinance—a strict liability crime—because she had no actual notice of the duty to register. The Court concluded Lambert's due process rights had been violated because the ordinance punished the failure to act or "conduct that is wholly passive" even when a defendant lacked actual notice of any potential liability. 355 U.S. at 228. In reaching that conclusion, the Court looked at various circumstances in which governmental

50

deprivations through civil penalties or forfeitures of property required notice and held "the principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case." 355 U.S. at 228. The Court found constructive notice of the ordinance through official publication insufficient, thus declining to apply the maxim that "ignorance of the law is no excuse" to uphold the criminalization of inaction under the ordinance. 355 U.S. at 228. In sum, the Court found the government overstepped due process limitations on its police powers by criminalizing a "mere failure to register [that] . . . . is unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." 355 U.S. at 228.

With that characterization of the ordinance's constitutional shortcomings, the Court seemed to reach both substantive and procedural due process protections. The procedural due process protection is rooted in an individual's right to fair notice and an opportunity to be heard before suffering the impairment of a liberty interest or the loss of a property right. *Jackson v. Virginia*, 443 U.S. 307, 314, 99 S. Ct. 2781, 61 L. Ed 2d 560 (1979) ("[A] person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend."); *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"). The ordinance didn't afford fair notice. In addition, however, the Court rejected the imposition of strict criminal liability for a wrong that consisted of inaction without something more—a concept tied to a substantive due process liberty interest rather than purely procedural due process considerations.

Particularly pertinent here, the *Lambert* Court's analysis, short as it is, functionally treated actual notice as a proxy for intent in gauging a constitutionally acceptable criminal violation of the ordinance. The Court did not analyze the constitutional defect in

51

the ordinance as a lack of intent. But the inevitable byproduct of its requirement for actual notice is a form of criminal intent to convict.

The Court found actual notice to be a necessary element to convict consistent with the Due Process Clause. If Lambert or any similar defendant had actual notice, then their failure to register would be in contravention of that notice and their knowledge of the ordinance's requirements. In that light, the failure to register would demonstrate a deliberateness consistent with general criminal intent or a traditional mens rea. Thus, if a strict liability crime constitutionally requires a defendant to have actual notice of the wrong because the wrong consists of a failure to act that is not itself apparently wrongful, then that requirement builds in a criminal intent. In other words, a failure to act with actual notice of the obligation to act evinces a form of bad intent duplicating a mens rea.

The Illinois Supreme Court employed that reasoning to uphold the penal provisions of that state's registration and reporting statutes covering convicted sex offenders. *People v. Molnar*, 222 Ill. 2d 495, 523, 857 N.E.2d 209 (2006). The statutes ostensibly imposed strict liability felony penalties for noncompliance. But the court found the scheme required actual notice to the sex offenders of their registration and reporting obligations to convict. The court described the notice requirement as "'built into'" the definition of the crime of failing to register. Accordingly, a defendant could not be "subject to a severe penalty for an offense he might unknowingly commit." 222 Ill. 2d at 523. Consistent with *Lambert*, the court effectively imputed a general criminal intent component to the offense, since a defendant could be convicted only for a knowing violation.[4]

[4]In a curious feat of judicial analysis in *Molnar*, the Illinois Supreme Court discussed and initially distinguished *Lambert* because the registration requirement in the Los Angeles ordinance applied to all convicted felons and the Illinois statutes applied only to convicted sex offenders. The court also pointed out that convicted sex offenders typically would be informed of their statutory duty to register and, therefore, would have

52

actual notice. 222 Ill. 2d at 513. Later in the opinion, the court held actual notice to be a necessary component of the crime of failing to register or report and drew heavily on the reasoning in *People v. Patterson*, 185 Misc. 2d 519, 708 N.Y.S.2d 815 (2000), that considered New York's sex offender registration statutes. 222 Ill. 2d at 523. The *Patterson* court, in turn, explicitly relied on *Lambert* to conclude that registrants had to be given fair or actual notice of their statutory obligations before they could be criminally prosecuted for a failure to comply. 185 Misc. 2d at 533-34.

Consistent with *Lambert* and *Molnar*, the penal provisions of KORA should be suffused with an actual notice requirement. To be constitutionally tolerable, K.S.A. 2019 Supp. 22-4903 must be construed to include actual notice as a condition precedent for successful prosecution, so a defendant cannot "unknowingly commit" a violation—to borrow the Illinois Supreme Court's phrase. A constitutionally mandated notice element then creates a concomitant intent that precludes conviction for an unwitting or good faith failure to comply with KORA. That roughly corresponds to requiring a "reckless" criminal intent or culpable mental state as defined in K.S.A. 2019 Supp. 21-5202(j). So violent offenders with actual notice of the KORA registration and reporting requirements could be convicted if they "consciously disregard[ed]" the "substantial . . . risk" of criminal prosecution they faced for failing to comply. See K.S.A. 2019 Supp, 21-5202(j) (defining "reckless" culpable mental state).

Genson's prosecution and conviction fell constitutionally short on that score. To be sure, Genson received actual notice of his duties under KORA and complied with them for a time. But the due process considerations of actual notice for a strict liability crime premised on punishing inaction necessarily impute a form of intent extending to the particular failure to comply. So the constitutional violation is this:

1. Genson had to receive actual notice of his registration and reporting obligations under KORA as a matter of due process, especially given the substantial criminal penalties.

53

2. To be successfully prosecuted, Genson had to act in disregard of that notice when he failed to report. In other words, Genson could not be convicted if the failure were unwitting or otherwise in good faith.

3. Genson proffered evidence that he was mentally debilitated in November 2017 and did not then appreciate or understand his obligation to register and report under KORA.

4. Genson was precluded from presenting evidence or having the jury consider his inability to appreciate or understand his KORA obligations, so he was convicted of what may have been an unknowing violation that cannot be reconciled with actual notice and the due process rights actual notice protects.

In short, the jury was not instructed on any notice due under KORA or that a failure to register or report had to be in derogation of that notice—implicating some measure of intent. The jury was required to find only that Genson had been convicted of a nonsexual crime covered under KORA, an element that was never in dispute, and that he failed to report in November 2017, which wasn't factually in dispute, either. As a result, Genson was barred from presenting a legitimate due process defense consistent with *Lambert*.

During the trial, Genson objected to the instruction defining the crime and had submitted a proposed instruction that included a mens rea element. I would conclude the district court's jury instruction on the elements of a KORA violation for failing to register or report was erroneous, and Genson preserved the issue. We would then examine whether "there is a 'reasonable probability that the error . . . did affect the outcome of the trial in light of the entire record.'" *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012) (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011]). Even if the instructional issue had not been preserved, we would review for clear error—a more

stringent standard demanding we be firmly "'convinced that the jury would have reached a different verdict'" had a proper instruction been given. *State v. Pulliam*, 308 Kan. 1354, 1369, 430 P.3d 39 (2018); see *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012) (recognizing standard for clear instructional error). Under either standard, I am persuaded the jury verdict could well have been different. The narrow remedy would require a reversal of Genson's conviction and a remand to the district court for a new trial with a jury instruction requiring the prosecution prove a reckless culpable mental state. At that trial, Genson could offer evidence that he did not wittingly or consciously disregard registering in November 2017.

More broadly, however, *Lambert* underscores the constitutional flaw in the KORA's penal provisions for noncompliance. The decision recognizes actual notice of a registration obligation for convicted felons as an antidote for a strict liability crime punishing a failure to register, when the act itself is not intrinsically harmful or dangerous. The Kansas appellate courts have construed KORA to permit convictions of defendants even though they have received incomplete notice or no actual notice of their registration and reporting obligations, despite the statutory duty of district courts and registering law enforcement agencies to inform them. See *State v. Marinelli*, 307 Kan. 768, 790-91, 415 P.3d 405 (2018); *State v. Anderson*, 40 Kan. App. 2d 69, 71-72, 188 P.3d 38 (2008). The failure to require actual notice renders K.S.A. 2019 Supp. 22-4903 constitutionally deficient as a strict liability crime.

*6. Majority's Defense of K.S.A. 2019 Supp. 22-4903*

The majority offers an array of arguments propping up the criminal penalties for failing to register and report under KORA. The defense of K.S.A. 2019 Supp. 22-4903 includes misguided constitutional analysis or inapposite authority and reasoning passed off as analogous.

● The majority submits the Legislature has the authority to enact strict liability offenses. And that's true. But the Legislature does not have the constitutional power to impose severe criminal penalties without an element of bad intent for what amounts to *malum prohibitum* conduct (really, inaction) as it has done in K.S.A. 2019 Supp. 22-4903. The majority tries to blunt that constitutional limitation because the United States Supreme Court has never articulated a specific formula or test to assess whether a strict liability crime satisfies the Due Process Clause or other constitutional restraints.

In a series of cases beginning with *Morissette*, a decision sometimes described as the first modern articulation of principles shaping strict liability offenses, the United States Supreme Court has identified various considerations bearing on their constitutional propriety. The confluence of harsh felony penalties criminalizing inaction without requiring any intent in furtherance of, at best, a limited public welfare objective in K.S.A. 2019 Supp. 22-4903 falls far short of what the Court has outlined as acceptable across those cases. To hold otherwise reflects an unwillingness to assay that legal ground and to mine the guiding principles readily found there. Although the Court has not offered a comprehensive standard or bright-line rule for when strict criminal liability exceeds constitutional limits, it has established rough measures dividing permissible from impermissible. As I have outlined, K.S.A. 2019 Supp. 22-4903 falls on the impermissible side of the division by some margin.

The majority cites *State v. Mountjoy*, 257 Kan. 163, 177, 891 P.2d 376 (1995), to demonstrate the Legislature's prerogative to enact strict liability offenses. In *Mountjoy*, the court held that K.S.A. 65-2803, the statute imposing civil and criminal sanctions on persons practicing a healing art in Kansas without having been licensed or after having their licenses revoked, created a strict liability crime punishable as a class B misdemeanor. The court pointed to the immediate and substantial adverse impact an unlicensed practitioner could have on the public health as warranting strict criminal liability. 257 Kan. at 177 ("Among all the objects sought to be secured by government,

56

none is more important than the preservation of the public health."). In reaching its conclusion, the court catalogued strict liability offenses the Legislature had enacted—a compilation the majority recites. See 257 Kan. at 175-76. They all carried mild penalties, as did the unlicensed practice of the healing arts.

That exercise does nothing to advance the majority's conclusion upholding the penalties in KORA for failing to register or report. This case doesn't call into question the Legislature's authority to adopt strict liability offenses punishable as misdemeanors. And certain actions may be considered so closely tied to an immediate danger to the public health, safety, or welfare that the Legislature presumably can constitutionally permit strict liability felony penalties, especially in those highly regulated industries and endeavors that put diligent participants on alert to examine their statutory duties and the concomitant liabilities for noncompliance. In 2014, the Legislature upped the crime of practicing a healing art without a license from a class B misdemeanor to a severity level 10 nonperson felony effective in 2015. See L. 2014, ch. 131, § 6; K.S.A. 65-2803(d). The appellate courts have not been called upon to consider the enhanced penalties. But KORA's penalties for convicted violent offenders and drug offenders stand apart, given the much harsher penalties visited on inaction posing no similar danger.

The majority also cites *United States v. Behrman*, 258 U.S. 280, 42 S. Ct. 303, 66 L. Ed. 619 (1922), and *United States v. Balint*, 258 U.S. 250, 42 S. Ct. 301, 66 L. Ed. 604 (1922), to support its position. But those companion cases are outliers in the present-day world of strict liability offenses. They uphold statutes Congress enacted a hundred years ago to combat the burgeoning use and abuse of opiates consistent with what was considered the federal government's comparatively restrained legislative authority under the Commerce Clause of the United States Constitution. The statutory measures did impose substantial felony penalties without proof of a mens rea. Those efforts, of course, have given way to a comprehensive statutory scheme defining a variety of serious drug offenses that do require proof of criminal intent. Part D of the United States Code, Title

21; see, e.g., 21 U.S.C. § 841 (2018). Contrary to the majority's suggestion, the *Morissette* Court endorsed neither those statutes nor the decisions in *Behrman* and *Balint*. The Court characterized the conclusion in those cases as having "our approval and adherence for the circumstances to which it was there applied"—elegantly and graciously confining the holdings to their facts. 342 U.S. at 260.[5]

[5]The majority does not mention another outlier that imposes a form of strict liability for a serious felony:  sexual intercourse with an ostensibly consenting child under the age of consent. In both its common-law and statutory iterations, the crime brooked no defense because the offender reasonably believed the victim to have been over the age of consent. Historically, the crime aimed to protect girls too young to knowingly make decisions to voluntarily participate in the sex act. See 65 Am. Jur. 2d Rape § 11 (elements of statutory rape); 6 Am. Jur. 2d Proof of Facts 63, Mistake as to Age of Statutory Rape Victim § 1 (historical basis for crime). The modern statutory version typically protects victims regardless of their gender. See, e.g., K.S.A. 2019 Supp. 21-5503(a)(3) (rape is "sexual intercourse with a child who is under 14 years of age"). Statutory rape serves an entirely appropriate public policy objective in deterring specific conduct viewed as repugnant for centuries. But the nature of the crime and its extended history keep it from serving as a significant precedent for strict liability offenses generally.

● The majority fumbles the necessary constitutional analysis by failing to acknowledge that the right to be free from unwarranted government internment, whether it be imprisonment or some other form of detention, is a fundamental liberty interest protected as a matter of substantive due process. The omission sets off a cascade of constitutional premises that are inapplicable. For example, K.S.A. 2019 Supp. 22-4903 cannot be accorded a presumption of constitutionality, and Genson does not carry the burden of proving the statute's unconstitutionality. Likewise, the majority concludes K.S.A. 2019 Supp. 22-4903 can be upheld even if it bears only some attenuated relationship to a public purpose, thereby invoking an incorrect and entirely too lax standard of judicial review.

● The majority makes much of cases upholding the federal Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20901 et seq. (2018), requiring

58

reporting and registration of convicted sex offenders. But the argument is doubly off the mark. First, SORNA applies only to sex offenders and does not address violent offenders at all. So the federal scheme is substantively distinguishable for that reason alone. Moreover, those cases affirm the registration and reporting obligations of SORNA without considering the punishments for noncompliance. Here, Genson is challenging only the strict liability criminal penalties imposed in K.S.A. 2019 Supp. 22-4903 for violating the registration and reporting requirements.

Unlike KORA, SORNA imposes criminal penalties on a covered person who "knowingly fails to register or update a registration as required." 18 U.S.C. § 2250(a)(3) (2018). So SORNA requires proof of a general criminal intent to convict. See *United States v. Fuller*, 627 F.3d 499, 501 (2d Cir. 2010) (criminal enforcement provision of SORNA establishes "a general intent crime"), *vacated on other grounds* 565 U.S. 1189, 132 S. Ct. 1534, 182 L. Ed. 2d 152 (2012); *United States v. Voice*, 622 F.3d 870, 876 (8th Cir. 2010). Contrary to the majority's suggestion, SORNA does not create a strict liability crime for noncompliance.

The majority also cites cases from Iowa and Illinois ostensibly for the proposition that strict liability criminal sanctions in registration and reporting statutes comparable to KORA have withstood substantive due process challenges. Neither case does that work.

In *In re Detention of Garren*, 620 N.W.2d 275, 277 (Iowa 2000), the Iowa Supreme Court upheld a statutory scheme civilly committing violent sexual predators for care and treatment. The Iowa commitment statutes were comparable to the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 et seq., and the court turned away a narrow substantive due process argument that the scheme was constitutionally infirm because it provided no less restrictive treatment placements to custodial inpatient care. 620 N.W.2d at 285. The *Garren* decision has no direct or analogous application to the constitutional propriety of the penal provisions in KORA.

In *People v. Malchow*, 306 Ill. App. 3d 665, 672-73, 714 N.E.2d 583 (1999), the Illinois Court of Appeals upheld the State's statutory registration and reporting requirements for convicted sex offenders against a due process challenge. In doing so, the court relied on the heightened danger convicted sex offenders pose to the general public, presaging the United States Supreme Court's analysis and conclusion in *Smith*, 538 U.S. at 103, 105-06. 306 Ill. App. 3d at 672-73. Malchow separately challenged the penalty provisions of Illinois scheme that treated the failure to comply as a felony; he argued the punishment violated the Ex Post Facto Clause and the Eighth Amendment of the United States Constitution. The court rejected those challenges. 306 Ill. App. 3d at 668-71. But Malchow did not argue the penalties violated his substantive due process liberty interests. And the court, therefore, did not address the point. The *Malchow* decision does little, if anything, to support the majority here. The majority does not mention the Illinois Supreme Court's later decision in *Molnar* that, as I have discussed, effectively imputes a de facto intent element to the penal provisions of that state's registration scheme for convicted sex offenders.

● The majority suggests any constitutional defect in the KORA penalty provisions doesn't matter here because the district court imposed a departure sentence on Genson to place him on probation rather than ordering him to prison. But the argument is a legal non sequitur. Simply because a defendant—here Genson—has received a lenient sentence in a particular case in no way undoes or even mitigates a fundamental constitutional deficiency in the statute occasioning the prosecution and punishment. Substantive due process protections do not wane on a district court's discretionary decision to temper its sentencing of a particular defendant. More to the point, perhaps, Genson has a felony conviction he should not.

*7. Conclusion*

Cast as strict liability crimes with harsh felony punishments imposed on the statutorily defined class of violent offenders without some form of bad intent, the penal provisions of KORA violate the Due Process Clause. They impermissibly burden a substantive due process right to liberty extended to all citizens, including convicted criminals. KORA criminalizes inaction that does not itself pose some risk or danger, and the registration of violent offenders has not been shown to advance a significant public welfare purpose in contrast to registration of convicted sex offenders.

The combination of those factors renders K.S.A. 2019 Supp. 22-4903 unenforceable under the Due Process Clause. Genson's conviction should be reversed, and his sentence should be vacated.

As I have suggested, there is no judicial fix for the constitutional defects in K.S.A. 2019 Supp. 22-4903. Two legislative options might be constitutionally acceptable. One would be a reversion to misdemeanor penalties for reasonably defined KORA violations imposed without criminal intent. Under that sort of penalty provision, Genson presumably would be guilty in this case.

The other would be reasonable felony penalties conditioned on actual notice to registrants and an intent on their part to evade registration and reporting. A combination of notice and a reckless culpable mental state would avert perceived fears that delinquent KORA offenders could successfully interpose an "I forgot" defense to prosecutions for failure to comply. As I have pointed out, recklessness, as a mens rea, has been proved when a person "consciously disregards a substantial and unjustifiable risk . . . that a result will follow." K.S.A. 2019 Supp. 21-5202(j). The disregard entails "a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j). Individuals on notice that they could be charged with a felony for

61

not registering and reporting would act recklessly if they failed to take steps to document, remember, and then adhere to those obligations. With that sort of penal sanction, an "I forgot" defense should be unsuccessful, although juror skepticism or even nullification might loom in a given case. Genson, however, would have had an entirely legitimate defense based on his mental incapacity in November 2017.

Those choices would be for the Legislature to make in the first instance, so I offer no further opinion on them. And since I am writing in dissent, any observations would be purely hypothetical.

But the Legislature constitutionally overstepped when it stripped away any intent or mens rea component for the incrementally more punitive penalties for noncompliance with KORA imposed on violent offenders, including Genson. The result cannot be reconciled with the substantive due process liberty interest grounded in the Fourteenth Amendment and longstanding constitutional limitations on the criminal law the United States Supreme Court has recognized to be necessary for the protection of that fundamental right. KORA stripped Genson of those protections and, therefore, deprived him of his constitutional rights.